UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------- x
UNITED STATES OF AMERICA,

v.

JOSE NUNEZ,

        Defendant.
------------------------------------------------------- x

USDC SNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: _August 16, 2013_

12 Cr. 778-2

**OPINION & ORDER**

HONORABLE PAUL A. CROTTY, United States District Judge:

    Defendant Jose Nunez ("Nunez") is charged with conspiracy to distribute, and possessing with intent to distribute, controlled substances. Nunez now moves to preclude disclosure of communications purportedly protected by the attorney-client privilege. The messages at issue were not produced, inadvertently or otherwise, by Nunez or by his then-attorney, Dwane Smith ("Smith"). Instead, the Government seized Nunez's emails and online chat records with Smith, pursuant to a warrant dated November 23, 2012, served on Google which hosted Nunez's email account. The Government contends that (1) Nunez waived the attorney-client privilege, (2) two of the emails are subject to the crime-fraud exception to the attorney-client privilege, (3) an online chat was conducted, in part, for the purposes of legal advice, and (4) the remaining emails were not confidential communications. Nunez's motion to preclude the use of the aforementioned communications is granted.

## BACKGROUND

    On September 10, 2012, Nunez and a co-defendant were arrested and subsequently charged with conspiracy to distribute, and possession with intent to distribute, controlled substances. On September 11, 2012, Nunez retained Smith, who had previously represented him in a number of civil matters. Nunez regarded Smith as his personal attorney. On November 29,

2012, the Government provided Nunez with, *inter alia*, a search warrant application for Nunez's Google email account (the "Gmail Account"). After receiving the contents of the Gmail Account from Google, the Government provided the contents of the account to Nunez on January 2, 2013. Several weeks later, on January 31, 2013, the Government emailed Smith to alert him that the Gmail Account contained approximately 460 emails between Smith and Nunez, which the Government had not read and which it would maintain separately from the other emails in the account.

Smith asked to be relieved as counsel for Nunez on April 3, 2013, due to potential conflicts of interest presented by the emails between himself and Nunez. New counsel was appointed for Nunez on April 18, 2013, pursuant to the Criminal Justice Act, and, on May 1, 2013, Nunez asserted for the first time that the emails between Smith and Nunez that were contained in the Gmail Account were subject to the attorney-client privilege, which he was not waiving. At the Court's direction, a Government "Wall Assistant" reviewed all of the emails between Smith and Nunez, identifying 78 communications regarding which there was a colorable claim of privilege (the "Potentially Privileged Emails"), and eight of which the Government contends are beyond the scope of that privilege, regardless of the waiver issue (the "Specified Emails").[1]

## DISCUSSION

### I. Legal Standard

"The attorney-client privilege is the oldest of the privileges for confidential communications known to the common law. Its purpose is to encourage full and frank communication between attorneys and their clients and thereby promote broader public interests

---

[1] A list of the Potentially Privileged Emails and sealed copies of the eight Specified Emails have been provided to, and reviewed by, the Court.

in the observance of law and administration of justice." Upjohn Co. v. U.S., 449 U.S. 383, 389 (1981) (citation omitted). "In order to balance this protection of confidentiality with the competing value of public disclosure, however, courts 'apply the privilege only where necessary to achieve its purpose' and 'construe the privilege narrowly because it renders relevant information undiscoverable.'" U.S. v. Meija, 655 F.3d 126, 132 (2d Cir. 2011) (quoting In re County of Erie, 473 F.3d 413, 418 (2d Cir. 2007)). The party asserting the privilege bears the burden of establishing that the communications in question are "(1) between a client and his or her attorney, (2) . . . intended to be, and in fact were, kept confidential, [and] (3) for the purpose of obtaining or providing legal advice." Id.

## II. Analysis

### 1. Waiver

Though it has rejected the notion that "all inadvertent disclosures mandate a finding of waiver," In re Grand Jury Proceedings, 219 F.3d 175, 188 (2d Cir. 2000), the Second Circuit has not addressed what factors control whether a party has waived the attorney-client privilege via inadvertent disclosure of privileged communications. As a result, the parties disagree as to the applicable law. Nunez relies on the principle that "[a]n attorney may not waive the privilege without his client's consent" because "the privilege belongs solely to the client and may only be waived by him." In re Von Bulow, 828 F.2d 94, 100-01 (2d Cir. 1987). Nevertheless, the Second Circuit went on to explain that

> A client may . . . by his actions impliedly waive the privilege or consent to disclosure. And an attorney may, in appropriate circumstances, possess an implied authority to waive the privilege on behalf of his client. Moreover, it is the client's responsibility to insure continued confidentiality of his communications.

Id. (quotations omitted). The Government, in turn, relies principally on a test set out by the Tenth Circuit, which has not previously been adopted in this district. See U.S. v. Ary, 518 F.3d

3

775, 783 (10th Cir. 2008).

Courts in this district have applied a four-factor test first set out in Lois Sportswear, U.S.A., Inc. v. Levi Strauss & Co., 104 F.R.D. 103 (S.D.N.Y. 1985), in order to assess whether the attorney-client privilege has been waived through inadvertent disclosure. The Lois factors include "(1) the reasonableness of the precautions to prevent inadvertent disclosure, (2) the time taken to rectify the error, (3) the scope of the discovery and the extent of the disclosure," and "(4) an over[arching] issue of fairness and the protection of an appropriate privilege which . . . must be judged against the care or negligence with which the privilege is guarded." Id. at 105. Although "[t]he four Lois factors are not perfectly applicable to this case because of the different discovery rules governing criminal cases" and civil cases, in which they are normally applied,[2] "the Lois test is still a useful framework to apply" and neither party has provided good reason for it to be abandoned. U.S. v. Gangi, 1 F. Supp. 2d 256, 264 (S.D.N.Y. 1998). Accordingly, the Court will use the Lois factors to determine whether Nunez's attorney-client privilege has been waived.

First, Nunez took reasonable precautions to prevent disclosure of his communications with Smith. The communications were located in his Gmail Account, which was protected by a password that was not disclosed to any third-parties. (Nunez Aff. ¶ 6.) No suggestion is made as to additional precautions Nunez might have taken with respect to his personal email. Indeed, Neither Nunez nor Smith disclosed any communications; instead the Government obtained them

---

[2] The Court is aware of only two criminal cases in which the Lois factors were applied, both of which are factually distinct from the case at bar. First, Judge Chin applied the Lois factors in a matter in which "a highly confidential, internal government memorandum – which [laid] out the Government's strategy and identifie[d] witnesses and victims – somehow made its way into a public court file" finding that the Government had waived its claim of privilege. Gangi, 1 F. Supp. 2d at 257-58. Second, Judge Sand applied the Lois factors where the U.S. Attorney's Office produced to defendants a hard drive containing governmental work product in addition to documents relevant to the case, finding that the defendants were not entitled to the work product. U.S. v. Rigas, 281 F. Supp. 2d 733, 742 (S.D.N.Y. 2003).

through the service of a search and seizure warrant on a third-party that hosted Nunez's email account. This factor militates in favor of finding that privilege has not been waived.

Second, courts generally allow a reasonable amount of time to claw back inadvertently disclosed documents, measured in days from the time that the disclosure is discovered, if not less. See, e.g., BNP Paribas, 2013 WL 2322678 at *7 (seven days); Fuller v. Interview, Inc., No. 07 Civ. 5728, 2009 WL 3241542. *5 (S.D.N.Y. Sept. 30, 2009) (three days); Apionishev v. Columbia Univ., No. 09 Civ. 6471, 2012 WL 208998, *11 (S.D.N.Y. Jan. 23, 2012) (party "acted within minutes"). Here, approximately 90 days passed between the time when the Government alerted Smith that the Gmail Account contained emails between himself and Nunez, and when Nunez's new counsel first asserted that the attorney-client privilege had not been waived. On the other hand, we are not dealing with "inadvertent disclosure," but rather with the seizure of documents. Perhaps Smith may have been dilatory, but he was distracted by the issue of his recusal. In these circumstances, the Court concludes that the second factor is neutral with respect to waiver.

Third, the scope of the discovery and the extent of disclosure are inapposite in the case at bar. "Courts generally decline to find waiver when 'a relatively small number of privileged documents were disclosed in comparison to the total number of documents produced,'" Rigas, 281 F. Supp. 2d at 741 (quoting Asian Vegetable Research & Dev. Ctr. v. Inst. of Int'l Educ., No. 94 Civ. 6551, 1995 WL 491491, *7 (S.D.N.Y. Aug. 17, 1995)), in recognition of "the reality that 'it is virtually impossible to avoid any error whatsoever in dealing with large volumes' of discovery materials." Id. (quoting S.E.C. v. Cassano, 189 F.R.D. 83, 86 (S.D.N.Y. 1999)). Though this can be rationally applied in the context of civil cases, where the party claiming the privilege typically reviewed and produced the communications at issue in the normal course of

discovery, it cannot control here, where the communications were not produced by either the attorney or client but by a third-party pursuant to a warrant.

Fourth, fairness militates in favor of finding that the privilege has not been waived. Since the Government has not argued that it "ha[s] already relied on the documents at issue," Bank Brussels Lambert v. Credit Lyonnais (Suisse) S.A., 160 F.R.D. 437, 446 (S.D.N.Y. 1995), it is unclear how the Govnerment's investigation or prosecution of Nunez would be prejudiced by the suppression of the Potentially Privileged Emails, beyond the deprivation of information to which it was not originally entitled. See Kalra v. HSBC Bank USA, N.A., No. 06 Civ. 5890, 2008 WL 1902223, *6 (E.D.N.Y. Apr. 28, 2008) (factor "does not . . . focus on 'whether the privilege itself deprives parties of pertinent information." (quoting Prescient Partners, LP v. Fieldcrest Cannon, Inc., No. 96 Civ. 7590, 1997 WL 736729, *7 (S.D.N.Y. Nov. 26, 1997))). Punishing Nunez for disclosures that, as discussed above, were not made by either him or his attorney, but rather by a third-party "outside of [his or Smith's] control" would be inequitable. Apionishev, 2012 WL 208998, *11.

Given the unique facts of this case, it would be unfair to hold against Nunez what would generally be considered to be an extended delay in attempting to remedy the inadvertent disclosure. Although Smith was notified of the disclosure on January 31, 2013, he subsequently sought to withdraw from his representation of Nunez based upon potential conflicts of interest relating to the very communications at issue. The Court does not, therefore, hold Nunez responsible for Smith's failure to assert the application of the privilege prior to his eventual withdrawal in April, 2013. Nunez's new counsel promptly raised the privilege issue at its first court appearance in this matter, approximately two weeks after its initial appointment. Nunez's newly appointed counsel was entitled to some modicum of time to familiarize itself with the

facts of this case, and with the disclosures in particular, before determining how to proceed. Waiting two weeks until a scheduled conference with the Court was not excessive. "On the other hand, [Nunez] will suffer a great disadvantage should a waiver of privilege be found, whereby [the Government] will be privy to, and will be able to use against [Nunez], privileged information concerning legal advice rendered to" Nunez by Smith. Kalra, 2008 WL 1902223 at *8. Based on the foregoing, the Court finds that Nunez has not waived the attorney-client privilege with respect to the Potentially Privileged Emails listed in Exhibit B.

2. Crime-Fraud Exception

On December 1, 2011, LCM Herbal, which apparently sold synthetic marijuana, terminated Nunez's employment via an email that attributed the termination to the company's decision to discontinue sales activity due to, *inter alia*, "legal restraints." Within a matter of hours, Nunez forwarded the email to Smith, asking whether he could "do something about this." On January 12, 2012, Nunez again forwarded the email in which he was terminated to Smith, this time omitting any additional questions or commentary.

"It is well-established that communications that otherwise would be protected by the attorney-client privilege . . . are not protected if they relate to client communications in furtherance of contemplated or ongoing criminal . . . conduct" because "advice in furtherance of such goals is socially perverse . . . and the client's communications seeking such advice are not worthy of protection." In re Grand Jury Subpoena Duces Tecum Dated Sept. 15, 1983, 731 F.2d 1032, 1038 (2d Cir. 1984). "[A] party seeking to invoke the crime-fraud exception must . . . demonstrate that there is probable cause to believe that a crime or fraud has been attempted or committed and that the communications were in furtherance thereof." In re Richard Roe, Inc., 68 F.3d 38, 40 (2d Cir. 1995).

The plain language of Nunez's December 1, 2012, email to Smith makes clear that Nunez is seeking advice related to what he believes to be his improper termination. Indeed, the Government concedes this point, acknowledging that "Nunez sought Mr. Smith's advice to further his interests *in a commercial dispute*" (Gov't Opp'n at 24 (emphasis added)) and fails to meet its burden of demonstrating that "there is probable cause to believe that the particular communication with counsel . . . was intended in some way to facilitate or to conceal the criminal activity." In re Richard Roe, 68 F.3d at 40. Even if the Court were to conclude that the vague reference to "legal restraints" in an email *to* Nunez was an acknowledgement *by* Nunez that he had engaged in illegal activity, the crime-fraud exception is not automatically triggered by a client providing "evidence that might support a finding of culpability" because "a simple finding of relevance does not demonstrate a criminal or fraudulent purpose" for engaging in the communications at issue. Id. at 40-42. The Second Circuit has made clear that "the crime-fraud exception does not apply simply because privileged communications would provide an adversary with evidence of a crime," but rather it "applies only when the court determines that the client communication . . . in question was *itself* in furtherance of the crime." Id. at 40 (emphasis in original). That was not the case with respect to the December 1, 2011 and January 12, 2012 emails. Accordingly, they do not fall within the crime-fraud exception.

3. <u>Confidential Communications Seeking Legal Advice</u>

The parties dispute whether the attorney-client privilege applies to five emails and one online chat, to which the Court turns first. The online chat took place on March 21, 2012, at which time Smith was representing Nunez in connection with his termination from LCM Herbal. Although the conversation primarily discusses Smith's request that Nunez visit a potential client of Smith's to pick up a retainer fee and agreement on his behalf, for which Smith offered to pay

Nunez, it also discusses the legality of Nunez's work for LCM Herbal and Smith's representation of Nunez on matters related to the sale of synthetic drugs. Accordingly, the relevant portion of the online chat is privileged.

Second, on March 29, 2012, Nunez sent Smith three separate emails regarding a local news story discussing New York's efforts to ban synthetic marijuana. In two emails on May 7, 2012, and July 11, 2012, Smith responded by sending Nunez a picture of a controlled substances schedule and subsequently sent an article from the New York Daily News discussing attempts by the Attorney General of New York to crack down on sellers of synthetic drugs.

The Government relies on U.S. v. Hall, 346 F.2d 875, 882 (2d Cir. 1965), for the proposition that these were not "confidential communication[s]" subject to the attorney-client privilege. In Hall, the Second Circuit found that a lawyer informing his client of a court date was not privileged because "counsel served merely as a conduit for transmission of a message." Id. Such "trial date cases" have been interpreted as relating to a broader theory that "the privilege does not apply to the lawyer's communications to the client of what the lawyer was told by third persons," such as adversarial parties, expert witnesses and courts. 24 Charles A. Wright et al., Federal Practice and Procedure § 5484 (2013) (arguing that this theory "distort[s]" and "does much to undermine the privilege with respect to the lawyer's communications").

Hall is inapposite to the communications at issue here, however. Unlike the communications in Hall, the March 29, 2012 emails were sent *by* the client *to* his attorney, seeking legal advice based on a news story that related directly to his former field of employment. See 1 Kenneth S. Broun, McCormick on Evidence § 89 (7th ed.) ("a letter from client to lawyer . . . will of course be privileged."). In this context, Smith's emails, consisting of a schedule of controlled substances from which synthetic marijuana is absent and a news article

discussing the state's efforts to force "storeowners to stop selling the products because they violate consumer protection laws for labeling", Kenneth Lovett, Clever A-Salt on New Drugs, N.Y. Daily News, July 11, 2012, at 2, are best understood as an indirect form of legal advice to Nunez. They are definitively not a "transmission of a message" from any third-party source for which Smith "merely served as a conduit," Hall, 346 F.2d at 882, nor has the Government cited any cases applying Hall to a communication relaying the result of an attorney's research to a client. The Court takes no position on the quality of Smith's legal representation of Nunez, but notes that there is no requirement that legal advice be concise, well-targeted or correct in order to be protected by the attorney-client privilege. Accordingly, the five emails sent on March 29, May 7, and July 11, 2012 are protected by the attorney-client privilege.

## CONCLUSION

For the foregoing reasons, Nunez's motion is granted in its entirety. The Clerk of Court is directed to terminate the motion at docket number 27.

Dated: New York, New York
August 16, 2013

SO ORDERED

_____
PAUL A. CROTTY
United States District Judge